UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| NIKI DASILVA, SAMANTHA LOZANO, and GABRIELLE MCLEMORE, | ) ) ) |
| *Plaintiffs*, | ) ) |
| *vs*. | ) ) |
| INDIANA HOUSE OF REPRESENTATIVES and INDIANA SENATE, | ) ) ) |
| *Defendants*. | ) ) |

No. 1:19-cv-02453-JMS-DLP

## <u>ORDER</u>

In March 2018, Plaintiffs Niki DaSilva, Samantha Lozano, and Gabrielle McLemore attended a gathering at AJ's Lounge in Indianapolis to celebrate the end of the legislative session for the Indiana General Assembly.  After each encountered then-Attorney General Curtis Hill at the gathering and were subjected to his inappropriate behavior, they complained to their employers – Defendants the Indiana House of Representatives (the "<u>House</u>") and the Indiana Senate (the "<u>Senate</u>").  Based on the handling of those complaints, they initiated this litigation and now assert claims against the House and Senate under Title VII of the Civil Rights Act of 1964 ("<u>Title VII</u>") for hostile work environment and retaliation.  The House and Senate have both filed Motions for Summary Judgment, [Filing No. 231; Filing No. 232], which are now ripe for the Court's consideration.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court

what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir.

2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard detailed above.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made."  *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).  The Court notes at the outset that Plaintiffs have failed to comply with Local Rule 56-1, which requires a party who opposes a summary judgment motion to include a section labeled "Statement of Material Facts in Dispute" "that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment."  S.D. Ind. L.R. 56-1(b).  Instead, Plaintiffs have included a twenty-page "Factual Background" section in their response briefs, which sets forth their version of the facts and does not attempt to demonstrate how their version differs from Defendants' version.  [*See* Filing No. 252 at 2-22; Filing No. 253 at 2-22.]  Plaintiffs' and Defendants' versions of the facts largely overlap but, where they conflict, the Court takes the Plaintiffs' version as true – as it must at the summary judgment stage.[1]

---

[1] Defendants argue that some of the evidence Plaintiffs rely upon is inadmissible, including a Ring doorbell receipt, [Filing No. 249-1], notes relating to a July 2, 2018 meeting between Attorney General Hill and others, [Filing No. 249-2], articles and advertisements in which Attorney General Hill attacks Plaintiffs' credibility, [Filing No. 248-27], transcripts from several interviews conducted by the Indiana Inspector General, [Filing No. 249-3; Filing No. 249-4], the Inspector General's Investigative Report, [Filing No. 248-22], the Hearing Officer's report in the disciplinary action against Attorney General Hill, [Filing No. 248-23], and the Indiana Supreme Court's decision in Attorney General Hill's disciplinary proceeding, [Filing No. 248-28].  Because consideration of this evidence does not alter the Court's decision, the Court declines to exclude it.

Plaintiffs have also included a "Statement of Genuine Issues In Dispute" section in their brief, which is not contemplated by Local Rule 56-1 and simply contains a list of legal issues followed by a lengthy string cite to evidence in the record (with no description of what that evidence is).  [*See, e.g.*, Filing No. 253 at 23 (Plaintiffs listing as a genuine issue in dispute "The unwelcome conduct that Plaintiffs experienced at the hands of the Attorney General was severe or pervasive enough to create a hostile work environment," followed by a string cite containing sixty-five citations to the record with no description of the evidence cited to or explanation of its significance).]  This section is unhelpful to the Court and amounts to undeveloped arguments that the Court will not consider.  *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments…are waived.") (quotation and citation omitted).  Nevertheless, the Court has done its best to present the facts in the light most favorable to Plaintiffs, and does so below.[2]

### A.    Indiana's Governmental Structure

Indiana's government is divided into three separate branches – the executive, the legislative, and the judicial.  Ind. Const. art. 3, § 1.  The three branches operate independently of each other, and "no person, charged with official duties under one of these [branches], shall exercise any of the functions of another."  *Id.*

---

[2] The Court also notes that Plaintiffs' response to the House's Motion for Summary Judgment is 38 pages, [Filing No. 253], and their response to the Senate's Motion for Summary Judgment is 39 pages, [Filing No. 252].  Both briefs exceed the 35-page limit for response briefs set forth in Local Rule 7-1(e)(1).  While the Court will consider the response briefs in full this time, Plaintiffs' counsel is cautioned that compliance with Court rules is not optional but is mandatory, and that they should have sought leave to file an overlong brief in which they would have been required to demonstrate "extraordinary and compelling reasons" for exceeding the page limit.  *See* S.D. Ind. L.R. 7-1(e)(2).

### 1.   The Attorney General

The Office of the Attorney General is part of the executive branch and is administered by the Attorney General.  Ind. Code § 4-6-1-2.  The Attorney General is a state-wide elected official, and his or her statutorily-conferred duties include the prosecution and defense of all suits by or against the State of Indiana.  *Id.*; Ind. Code 4-6-2-1, *et seq.*  The Attorney General shall have those employees "as the attorney general considers necessary to promptly and efficiently perform the duties of the attorney general's office, and which shall be selected and appointed by the attorney general."  Ind. Code § 4-6-1-4.  The Attorney General must keep his or her office in the Statehouse and must be present "on all business days, during business hours…at the office, in person or by deputy, unless engaged in court or elsewhere in the service of the state."  Ind. Code § 4-6-2-3.  Curtis Hill was sworn in as the Indiana Attorney General on January 9, 2017.  [Filing No. 248-20 at 32-33.]

### 2.   The House

The legislative authority of the State of Indiana is vested in the General Assembly, which is comprised of the House and the Senate.  Ind. Const. art. 4, § 1.  The House and the Senate have "all powers[ ] necessary for a branch of the Legislative department of a free and independent State," and each shall "determine its rules of proceeding."  *Id.* at § 16.  The Speaker of the House "retains the ultimate authority over hiring decisions, should he or she wish to exercise it," although most personnel issues are handled within each caucus by the appropriate Chief of Staff.  [Filing No. 231-1 at 20.]

The House is committed to providing a work environment in which all employees are treated with respect and are free from harassment based on sex and other protected categories. [Filing No. 231-14 at 17.]  The House strictly prohibits harassment in any form and encourages its

employees to report harassment immediately.  [Filing No. 231-14 at 17-19; Filing No. 231-15 at 17-19.]  The House Personnel Handbook provides:

> Any employee who believes that he or she has been harassed by a member of the House or staff, immediate supervisor, agent of the House, or an individual with whom the employee is required to have contact, should report the incident and names of the individuals involved immediately to their immediate supervisor, the appropriate Chief of Staff, the appropriate Chief Counsel or the Clerk. Alternatively, the employee may directly contact the Equal Employment Opportunity Commission.

[Filing No. 231-14 at 19; Filing No. 231-15 at 19.]

A House employee who violates the harassment policy is subject to disciplinary action, and the action does not need to be progressive and may include termination of employment and civil or criminal prosecution.  [Filing No. 231-14 at 19; Filing No. 231-15 at 19.]  Additionally, House employees are required to complete periodic sexual harassment training.  [Filing No. 231-14 at 18; Filing No. 231-15 at 18.]

### 3.    *The Senate*

The President *Pro Tempore* of the Senate, or his or her designee, has final responsibility and authority with respect to hiring decisions, disciplinary actions, terminations, pay increases, and promotions.  [Filing No. 232-16 at 6; Filing No. 232-17 at 5.]

The Senate is committed to a work environment in which all employees are treated with respect and are free from harassment based on sex and other protected categories.  [Filing No. 232-16 at 7; Filing No. 232-17 at 6.]  The Senate strictly prohibits harassment in any form and encourages its employees to report harassment immediately.  [Filing No. 232-16 at 7-8; Filing No. 232-17 at 6.]  The Senate Employee Handbook provides:

> Any employee who believes he or she has been harassed by a member of the Senate or employee, supervisor, agent of the Senate, or an individual with whom the employee is required to have contact should report the incident and name of the individual involved immediately.  A report of harassment should be made first to

the employee's immediate supervisor.   However, if the employee's immediate supervisor is unavailable to receive the report or is in any way involved in the incident, the report should be made to the Majority Chief of Staff or to the [Secretary of the Senate/Majority Chief Legal Counsel].

[Filing No. 232-16 at 8; Filing No. 232-17 at 7.]

A Senate employee who violates the harassment policy is subject to disciplinary action, which does not need to be progressive and may include termination of employment and civil or criminal prosecution.  [Filing No. 232-16 at 8; Filing No. 232-17 at 7.]  All Senate employees are required to complete periodic sexual harassment training.  [Filing No. 232-16 at 8; Filing No. 232-17 at 7.]

**B.     Plaintiffs' Positions at the House and the Senate**

Ms. Lozano was an intern for the House Democrats starting in August 2017, and began working as a legislative assistant for the House Democratic Caucus on January 1, 2018.  [Filing No. 231-1 at 14.]   Ms. Lozano was assigned to assist three representatives, including Representative Mara Reardon.  [Filing No. 248-5 at 8.]  While the representatives she was assigned to assist changed over time, she was Representative Reardon's legislative assistant in March 2018 at the close of the legislative session.  [Filing No. 248-5 at 13; Filing No. 248-5 at 16; Filing No. 248-11 at 6.]  During her employment, Ms. Lozano periodically received copies of the House's Employee Handbook when it was updated or changed, and she acknowledged that she had received and understood the policies set forth in the handbook.  [Filing No. 231-1 at 19-21.]

Ms. DaSilva was an intern with the Senate Republicans in 2015 and began working as a legislative assistant for the Senate in the summer of 2016.  [Filing No. 232-3 at 28.]  Ms. DaSilva was assigned to support Senator Ryan Mishler for the majority of her employment.  [Filing No. 232-3 at 66.]  Attorney General Hill had visited Senator Mishler's office at times, but Ms. DaSilva's relationship with Attorney General Hill was "minimal at best."  [Filing No. 232-2 at 181-82.]  Ms.

7

DaSilva periodically reviewed the Senate's Employee Handbook during her employment, and each time she received the handbook, she acknowledged that she had received it, read it, and understood it.  [Filing No. 232-3 at 29-31.]   The Senate also walked through its polices prohibiting discrimination and harassment with employees annually.  [Filing No. 232-3 at 31.]

Ms. McLemore was an Indiana Senate intern in 2015 and was hired by the Senate as a press secretary for the Senate Democrats in September 2016.  [Filing No. 232-4 at 15; Filing No. 248-4 at 9-10.]  She also received the Senate's Employee Handbook periodically as it was updated, and certified that she had received it and understood each version of the handbook.  [Filing No. 232-4 at 22.]  Ms. McLemore attended annual training sessions on Senate policies, which included opportunities to ask questions.  [Filing No. 232-4 at 22-23.]

C.     The Sine Die Event

On the last day of the legislative session, legislators, lobbyists, and staff often gather at informal parties to celebrate the end of the session.  [Filing No. 232-13 at 1.]  The parties are organized informally, by word of mouth, and are not sponsored by the House or the Senate, nor do they appear on the legislative social calendar.  [Filing No. 232-1 at 45; Filing No. 232-3 at 61-62; Filing No. 232-4 at 38-39.]  Attendance at the parties is strictly voluntary.  [Filing No. 232-1 at 45; Filing No. 232-3 at 61-62; Filing No. 232-4 at 38-39.]  It is a work-related event, however.  [Filing No. 231-3 at 30-31; Filing No. 248-23 at 3.]  One of these parties occurred during the early morning hours of March 15, 2018 at AJ's Lounge in Indianapolis ("the Sine Die Event").  [Filing No. 232-3 at 39; Filing No. 232-3 at 44; Filing No. 232-4 at 23.]

Attendees at the Sine Die Event "were unpleasantly surprised when [Attorney General Hill] appeared at the party and made passes at several of the women," and "[a]s the evening lengthened [he] progressed from verbal to physical harassment." *DaSilva v. Indiana*, 30 F.4th 671, 672 (7th

8

Cir. 2022).[3]  Ms. Lozano rode to AJ's Lounge for the Sine Die Event with Representative Reardon and they arrived around 1:00 a.m.  [Filing No. 248-11 at 12; Filing No. 248-11 at 16.]  Ms. Lozano noticed Attorney General Hill with a group of people when she walked in.  [Filing No. 248-13 at 6.]  It was unusual for Attorney General Hill to be at the Sine Die Event because it is an event for legislative staff, lobbyists, and legislators.  [Filing No. 248-11 at 14; Filing No. 248-12 at 19-20; Filing No. 248-19 at 13.]  Representative Reardon and Attorney General Hill said hello to each other, and Attorney General Hill leaned in, put his hand on Representative Reardon's bare back, and slid his hand all the way down her back and grabbed her butt.  [Filing No. 248-11 at 20.]  Attorney General Hill had his thumb in Representative Reardon's dress and his fingers on her butt and clinched his hand.  [Filing No. 248-11 at 20-21.]  Representative Reardon said to Attorney General Hill "back off," and walked away.  [Filing No. 248-11 at 22.]  Representative Reardon did not consent to the Attorney General's conduct and she was shocked, violated, angry, and afraid.  [Filing No. 231-3 at 37-38.]

Ms. Lozano was standing a few feet behind Representative Reardon, and she saw the Attorney General touch Representative Reardon on her back and slowly rub his hand down her back, which Ms. Lozano found concerning and disturbing.  [Filing No. 248-13 at 7-8.]  Ms. Lozano had to look away because she was so bothered by Attorney General Hill's actions.  [Filing No. 248-13 at 12.]  Ms. Lozano walked away to look for her friend.  [Filing No. 248-13 at 12.]

Representative Reardon then walked over to another group of people standing in a circle and the Attorney General came back behind Representative Reardon and she heard him say, "that

---

[3] This case relates to Plaintiffs' appeal of the Court's grant of a Motion to Dismiss filed by Attorney General Hill and the State of Indiana – the original Defendants in this case.  The Seventh Circuit Court of Appeals affirmed this Court's dismissal of the claims against Attorney General Hill and the State of Indiana.

skin, that back" as he reached out to touch her shoulder.  [Filing No. 248-11 at 22-24.]  As soon as Attorney General Hill touched Representative Reardon's shoulder, she moved away from him and went to the other side of the circle.  [Filing No. 248-11 at 24.]

Ms. Lozano walked over toward the bar to greet some of her friends and co-workers. [Filing No. 248-5 at 23.]  While she was standing with a group of people, Attorney General Hill approached her and asked, "Do you know who I am?"  [Filing No. 248-5 at 26.]  Ms. Lozano said yes and that she went to college with Attorney General Hill's daughter.  [Filing No. 248-5 at 24.] Ms. Lozano hoped that Attorney General Hill would understand that she was his daughter's age and would not approach her or touch her in the way that he had touched Representative Reardon. [Filing No. 248-5 at 24-25.]

Meanwhile, Ms. DaSilva rode to AJ's Lounge for the Sine Die Event with Senator Mishler and a lobbyist and also arrived around 1:00 a.m.  [Filing No. 231-3 at 179-80.]  Attorney General Hill was there when they arrived.  [Filing No. 249-4 at 5.]  Ms. DaSilva went to the bar to order a drink and stood behind Senator Mishler with three staffers and, while she waited to order, Attorney General Hill came over to the bar, put his arm around Ms. DaSilva, and asked her and the other women why they were standing at the bar.  [Filing No. 249-4 at 6; Filing No. 231-3 at 183.]  When they responded that they were waiting for their drinks, Attorney General Hill said, "don't you know how to get a drink?  You have to show your knee, you have to show a little skin."  [Filing No. 231-3 at 183.]  Ms. DaSilva's mouth dropped open, and she felt uncomfortable.  [Filing No. 231-3 at 184.]  She would have said something if it were not the Attorney General making the statement. [Filing No. 231-3 at 184-85.]  Senator Mishler saw Attorney General Hill walk up and put his arm around Ms. DaSilva and two other females and say, "Don't you ladies know how to get service?"

[Filing No. 249-4 at 6.]  He also saw Attorney General Hill hug another female and put his hand on her butt.  [Filing No. 249-4 at 10.]

Following her initial interaction with Attorney General Hill, Ms. Lozano went to the bar to get a drink and Attorney General Hill was nearby drinking a martini.  [Filing No. 248-5 at 27.] Ms. Lozano commented that the room was hot, and Attorney General Hill said, "Yeah, you're really hot," which made Ms. Lozano uncomfortable.  [Filing No. 248-5 at 27.]  Attorney General Hill then put his arm around Ms. Lozano's waist and brought her closer to him, hugging her.  [Filing No. 248-5 at 27.]  Ms. Lozano did not feel comfortable, did not like it, and tried to sit on a bar stool to create some space between her and Attorney General Hill.  [Filing No. 248-5 at 27.]  Ms. Lozano gave Ms. DaSilva a look, and Ms. DaSilva came and stood between Ms. Lozano and Attorney General Hill.  [Filing No. 248-5 at 28.]  Ms. Lozano walked away to try to avoid further contact with Attorney General Hill.  [Filing No. 248-5 at 29.]

Attorney General Hill then put his hand on Ms. DaSilva's back.  [Filing No. 231-3 at 187.] Ms. DaSilva froze, and Attorney General Hill's hand began moving down her back.  [Filing No. 231-3 at 188.]  Ms. DaSilva tried to move the Attorney General's hand with her free hand, but he grabbed it and pulled her hand and arm down with his and touched her butt.  [Filing No. 231-3 at 188-89.]  After Attorney General Hill touched Ms. DaSilva's butt, he let go of her hand and stared at her, smirking.  [Filing No. 231-3 at 190-91.]  Ms. DaSilva felt white-hot anger and embarrassment and found the quickest way to get away from Attorney General Hill.  [Filing No. 231-3 at 191-92.]  She was in shock, upset, embarrassed, ashamed, and felt violated.  [Filing No. 248-1 at 20; Filing No. 248-1 at 26.]  While still at AJ's Lounge, Ms. DaSilva told a representative and some others what Attorney General Hill had done to her.  [Filing No. 248-1 at 27; Filing No.

248-1 at 31.]  Neither Ms. Lozano nor Ms. DaSilva consented to being touched by Attorney

General Hill.  [Filing No. 231-3 at 134; Filing No. 231-3 at 192.]

Ms. McLemore arrived to the Sine Die Event sometime after 1:00 a.m.  [Filing No. 248-12 at 6-7.]  Shortly after she arrived, she learned from others that Attorney General Hill was there and was "behaving weirdly."  [Filing No. 248-4 at 36-37.]  Ms. McLemore was sitting at the bar on a bar stool that had no back when Attorney General Hill approached her, pulled up a stool next to her, sat down, and asked, "Do you know who I am?"  [Filing No. 248-12 at 21-23.]  Attorney General Hill then put his hand on Ms. McLemore's back and began rubbing her entire back, up and down, slowly.  [Filing No. 248-12 at 24-25.]  Ms. McLemore was trapped between the bar and Attorney General Hill and mouthed "help me" to her intern, who walked over and asked Ms. McLemore if she wanted to go to the bathroom with her.  [Filing No. 231-3 at 243-44; Filing No. 248-12 at 25.]  Ms. McLemore and the intern then went into the bathroom and Ms. McLemore told the intern what had happened.  [Filing No. 248-12 at 25; Filing No. 248-12 at 29.]  Ms. McLemore was emotional because Attorney General Hill had touched her and she was concerned that people would think she had "brought this on [herself] somehow."  [Filing No. 248-12 at 26.]  Ms. McLemore then went outside with the intern and was crying.  [Filing No. 248-12 at 30.]  Ms. McLemore did not consent to Attorney General Hill rubbing her back and did not feel comfortable saying anything to Attorney General Hill because of his position.  [Filing No. 231-3 at 246.]  Following the Sine Die Event, if Ms. McLemore saw Attorney General Hill in the Statehouse, she

would go in the opposite direction.  [Filing No. 248-4 at 33-34.][4]

### D.     Plaintiffs Tell Others About Attorney General Hill's Inappropriate Conduct

Ms. DaSilva rode home from the Sine Die Event with Senator Mishler and Laura McCaffrey, a lobbyist, and told them about her interactions with Attorney General Hill.  [Filing No. 248-1 at 32; Filing No. 248-16 at 9; Filing No. 248-16 at 16-19.]

The next workday following the Sine Die Event, Ms. McLemore discussed her interaction with Attorney General Hill with her officemates.  [Filing No. 232-4 at 25-26; Filing No. 232-4 at 36.]  One of her co-workers told her that she should tell the Minority Chief of Staff about Attorney General Hill.  [Filing No. 232-4 at 26.]  Ms. McLemore did not tell her Chief of Staff, even though she trusted the Chief of Staff to take the allegations seriously.  [Filing No. 232-4 at 26.]  She did not think anything would be done in response to her making a report based on her experience and her knowledge regarding how the Senate had handled a report of sexual harassment from one of her co-workers in the past.  [Filing No. 248-4 at 62-68.]

Ms. Lozano also discussed Attorney General Hill's conduct with her co-workers the next workday.  [Filing No. 248-13 at 23-24.]  Ms. Lozano told her co-workers that Attorney General Hill was acting weird, creepy, and inappropriate.  [Filing No. 248-13 at 24.]

A few weeks after the Sine Die Event, Ms. McLemore learned from Senator Greg Taylor that he had witnessed her interaction with Attorney General Hill.  [Filing No. 248-4 at 38.]  Senator

---

[4] Other attendees at the Sine Die Event observed Attorney General Hill's inappropriate behavior, including: (1) Representative Ryan Hatfield, who was talking with three women with the first name Laura, and who Attorney General Hill approached and said "how did you get so lucky, teach me your ways with the three beautiful blonde-haired, blue-eyed Lauras," [Filing No. 248-16 at 14-15; Filing No. 248-19 at 14-19]; (2) Laura McCaffrey, Laura Johnson, and Laura Brown, who were the subject of Attorney General Hill's "Lauras" comment, which made them all feel uncomfortable, [Filing No. 248-16 at 14-15]; and (3) Donna Smith, a legislative assistant who noticed that every time a female would walk by Attorney General Hill, he would use his body to rub up against them, [Filing No. 248-15 at 14-16].

Taylor apologized to Ms. McLemore for not doing anything in response to Attorney General Hill touching her.  [Filing No. 248-4 at 39-40; Filing No. 248-12 at 32.]

Ms. McLemore's Chief of Staff later learned of Ms. McLemore's interaction with Attorney General Hill and that Democratic Caucus members were already working to respond to Attorney General Hill's behavior.  [Filing No. 232-14 at 1-2.]  Sometime in April 2018, a few weeks after Ms. McLemore had spoken to Senator Taylor, Senator Jean Breaux questioned Ms. McLemore about her interaction with Attorney General Hill at the Sine Die Event and suggested that Ms. McLemore report the incident to Senate leadership.  [Filing No. 232-4 at 27-28.]  Ms. McLemore stated that she would think about it.  [Filing No. 232-4 at 27-28.]  During this time, Ms. McLemore also discussed her interaction with Attorney General Hill at the Sine Die Event with the Chief of Staff for the Senate Democrats.  [Filing No. 232-4 at 28-29.]  The Chief of Staff offered to assist Ms. McLemore in documenting her allegations with Senate leadership.  [Filing No. 232-4 at 29.]

Within a week of their first meeting, Ms. McLemore and Senator Breaux met a second time and Ms. McLemore advised Senator Breaux that she was ready to report her interaction with Attorney General Hill at the Sine Die Event to Senate leadership.  [Filing No. 232-4 at 28-29.] Ms. McLemore met with Senate leadership shortly thereafter.  [Filing No. 232-4 at 28-29.]

In April 2018, Ms. Lozano spoke to Representative Reardon and another representative about what had occurred at the Sine Die Event.  [Filing No. 231-3 at 85; Filing No. 248-5 at 30; Filing No. 248-13 at 25.]  Representative Reardon mentioned her experience with Attorney General Hill at the Sine Die Event and then Ms. Lozano told Representative Reardon and the other representative about her interactions with Attorney General Hill and that he was acting "weird and creepy."  [Filing No. 248-11 at 30-31; Filing No. 248-13 at 26-28.]  Representative Reardon told

Ms. Lozano that she wanted to inform leadership about Attorney General Hill's conduct.  [Filing No. 248-5 at 31-32.]

### E.    The House and Senate Learn of and Begin Investigating Attorney General Hill's Inappropriate Conduct

On May 14, 2018, the General Assembly reconvened for a special legislative session. [Filing No. 231-7 at 20-21; Filing No. 231-9 at 5; Filing No. 231-12 at 12; Filing No. 231-12 at 15.] That day, Representative Reardon approached Ms. DaSilva and asked about her interaction with Attorney General Hill at the Sine Die Event.  [Filing No. 232-3 at 44.]  Representative Reardon told Ms. DaSilva that Attorney General Hill had also touched her, and that she was going to report his conduct to House leadership.  [Filing No. 232-2 at 199; Filing No. 232-3 at 44.]  After speaking with Representative Reardon, Ms. DaSilva also told Senator Mishler about her interactions with Attorney General Hill at the Sine Die Event.  [Filing No. 232-2 at 199-200.]

The same day, Representative Reardon went to the minority House leader, Representative Terry Goodin, and reported Attorney General Hill's conduct.   [Filing No. 231-3 at 46-47.] Representative Goodin told Representative Reardon that they needed to take the matter to the Speaker of the House, Brian Bosma.  [Filing No. 231-3 at 47.]  Representative Goodin and Representative Reardon met with Speaker Bosma and reported Attorney General Hill's conduct. [Filing No. 231-3 at 48.]  Representative Reardon described what happened to her and stated that Attorney General Hill had been inappropriate with staffers, including a Senate staffer.  [Filing No. 231-3 at 48-49; Filing No. 248-6 at 12.]  This was the first time Speaker Bosma learned about Attorney General Hill's conduct toward staff at the Sine Die Event, including a Senate staff member.  [Filing No. 231-7 at 23-24.]  Because the allegations also involved Senate staff, Speaker Bosma alerted the President *Pro Tempore* of the Senate, David Long.  [Filing No. 231-7 at 24-25.] Speaker Bosma and Senator Long then spoke with minority leaders Representative Goodin and

Senator Tim Lanane, and the four decided to immediately launch an internal investigation into the allegations. [Filing No. 231-7 at 25-26; Filing No. 231-9 at 9-11.]

On May 15, 2018, House and Senate leadership, including Speaker Bosma, Senator Long, Senator Lanane, and Representative Goodin, decided to speak to the staffers. [Filing No. 248-17 at 9.] The House Chief Counsel and Principal Clerk interviewed Ms. Lozano about her allegations. [Filing No. 231-1 at 28.] Ms. Lozano described her interactions with Attorney General Hill at the Sine Die Event, as well as what she had observed between Attorney General Hill and Representative Reardon that night. [Filing No. 231-2 at 45-46.] Ms. Lozano confirmed that she did not have, and did not expect to have, any direct interaction with Attorney General Hill as part of her daily job duties. [Filing No. 231-1 at 28.] Ms. Lozano advised that a formal apology from Attorney General Hill would be sufficient, and that the fact that Speaker Bosma was paying close attention to the situation and taking action meant a lot to her. [Filing No. 231-1 at 28.] The House Chief Counsel advised Ms. Lozano that the House was committed to thoroughly investigating the complaints about Attorney General Hill and assured Ms. Lozano that she would not be subject to retaliation for raising her concerns. [Filing No. 231-1 at 28.]

Also on May 15, Ms. DaSilva met with Senator Long, Senator Mishler, Majority Chief of Staff Skip Brown, and Majority Attorney Mitchell Osterday to discuss what had taken place at the Sine Die Event. [Filing No. 232-3 at 45; Filing No. 232-10 at 12-14; Filing No. 232-10 at 20.] This meeting was the first time Ms. DaSilva had disclosed her allegations against Attorney General Hill to Senate leadership, and they told Ms. DaSilva that they would support her and try to respect her wishes. [Filing No. 232-3 at 56-57; Filing No. 232-10 at 13-15.] Senator Mishler did not think of the meeting as part of an investigation because in all of his conversations with Senator Long,

they discussed that they were merely trying to determine if the Senate had any liability.  [Filing No. 249-4 at 20.]

Ms. McLemore also met with Senator Long, Senator Lanane, and the respective caucus Chiefs of Staff to discuss her interaction with Attorney General Hill at the Sine Die Event.  [Filing No. 232-4 at 29-30.]  At the meeting, Ms. McLemore said that what had occurred at the Sine Die Event made her very uncomfortable and emotional, and she received assurances that she was protected.  [Filing No. 232-4 at 30.]

### F.     The House and Senate Engage Outside Counsel

Around the same time, leadership authorized Attorney George Angelone, the Executive Director of Legislative Services, to engage outside counsel to determine if the House and Senate had any liability in connection with Attorney General Hill's conduct.  [Filing No. 248-17 at 12; Filing No. 248-18 at 12-13.]   In a confidential memorandum dated June 18, 2018 ("the Memorandum"), outside counsel concluded that the General Assembly had conducted a prompt and effective investigation, and that Attorney General Hill's conduct did not constitute sexual harassment in violation of Title VII.  [Filing No. 232-7 at 27; Filing No. 232-10 at 18-19; Filing No. 232-29 at 2-9; Filing No. 232-30 at 2-9.]  At the request of some of the complainants, and pursuant to the attorney-client privilege and applicable state law, the legislative leaders considered the Memorandum to be confidential and restricted from public access.  [Filing No. 232-7 at 41-42; Filing No. 232-8 at 57-58; Filing No. 232-10 at 36-37.]

### G.     The House and Senate Confront Attorney General Hill Regarding His Inappropriate Conduct

Based on the recommendation of outside counsel, Speaker Bosma, Senator Long, Representative Goodin, and Senator Lanane planned to speak with Attorney General Hill on July 2 or July 3, 2018.  [Filing No. 232-8 at 40; Filing No. 232-10 at 28-29.]  However, Speaker Bosma

17

learned of media inquiries into the investigation while he was traveling abroad.  [Filing No. 232-8 at 40-41.]  Specifically, Speaker Bosma and Senator Long learned on June 29, 2018 that the *Indianapolis Star* was writing an article on the Attorney General's conduct at the Sine Die Event. [Filing No. 248-17 at 14.]  Speaker Bosma and Senator Long thought they owed it to the Attorney General to let him know before an article was published or before he was approached, and they arranged to speak with Attorney General Hill via telephone on June 29, 2018 to inform him of the allegations related to his inappropriate conduct at the Sine Die Event.  [Filing No. 248-17 at 14-15; Filing No. 232-10 at 23-25.]

During the telephone call, Speaker Bosma informed Attorney General Hill that they had received reports that Attorney General Hill had inappropriately touched multiple women at the Sine Die Event and that the House and Senate had retained counsel to advise them regarding the investigation into those allegations.  [Filing No. 232-8 at 42-43; Filing No. 232-10 at 25-26; Filing No. 248-17 at 15-18.]  Attorney General Hill felt that they had reached out to him because of the forthcoming *Indianapolis Star* article.  [Filing No. 248-20 at 11.]  Speaker Bosma admonished Attorney General Hill that his behavior was inappropriate and unacceptable; that there was to be absolutely no interaction between Attorney General Hill and any of the Senate's or House's employees, no retaliation, and no effort to attempt to identify the individuals who reported his actions; and that Attorney General Hill was not permitted to attend any legislative gatherings. [Filing No. 232-8 at 32-33; Filing No. 232-8 at 42-43; Filing No. 232-10 at 25-26.]  Attorney General Hill asked if they could meet on July 2 when they would all be back in Indianapolis, and Speaker Bosma and Senator Long indicated that was a good idea.  [Filing No. 248-20 at 12.]

On July 2, 2018, Speaker Bosma met with Ms. Lozano and advised her that he had admonished Attorney General Hill not to have any contact with legislative staffers.  [Filing No.

231-1 at 28-29.] Speaker Bosma asked Ms. Lozano to notify him or Representative Goodin if Attorney General Hill contacted her or made her uncomfortable. [Filing No. 231-1 at 29.] After July 2, 2018, Ms. Lozano did not contact Speaker Bosma or Representative Goodin about having contact with Attorney General Hill or being made to feel uncomfortable by him. [Filing No. 231-1 at 29.] Ms. Lozano was satisfied with the outcome of the investigation and appreciated how the situation was handled. [Filing No. 231-12 at 56; Filing No. 231-21 at 1.]

Also on July 2, 2018, Senator Long and Senator Lanane met with Ms. McLemore. [Filing No. 232-4 at 31.] Senator Long told Ms. McLemore that the Senate had hired outside counsel to ensure that the General Assembly was following proper procedures and that outside counsel had prepared the Memorandum. [Filing No. 232-4 at 31.] Senator Long reassured Ms. McLemore that the Senate would maintain the Memorandum as an internal document, and asked Ms. McLemore to inform Senator Lanane or the Minority Chief of Staff if Attorney General Hill contacted her in the future in any way that made her uncomfortable. [Filing No. 232-4 at 31; Filing No. 232-11 at 2.] Ms. McLemore stated that she was satisfied with the Senate's investigation. [Filing No. 232-4 at 32.]

Senator Long and his Chief of Staff also met with Ms. DaSilva on July 2, 2018, to update her on the Senate's investigation. [Filing No. 232-3 at 45; Filing No. 232-10 at 39-40.] Senator Long told Ms. DaSilva that he had spoken with Attorney General Hill about the allegations against him, and asked Ms. DaSilva to immediately inform him or the Majority Chief of Staff if she was contacted by Attorney General Hill in the future in any way that made her uncomfortable. [Filing No. 232-3 at 46; Filing No. 232-11 at 2.] Ms. DaSilva later stated that she believed the Senate had supported her and respected her wishes during the investigation. [Filing No. 232-3 at 47; Filing No. 232-20 at 4.]

Because the *Indianapolis Star* was going to write an article, leadership put together a joint statement regarding the allegations against Attorney General Hill.  [Filing No. 248-17 at 23-24.] The statement read:

> On Monday, May 14, legislative leaders were first made aware of employee concerns regarding Attorney General Hill's conduct at a social gathering at the closing of this year's legislative session.  House and Senate personnel policies strictly prohibit all forms of sexual harassment and clearly state that no employee should be subjected to unsolicited or unwelcome sexual advances or conduct, either verbal or physical.  In accordance with House and Senate policies, interviews of those employees expressing concern were immediately conducted and outside counsel was engaged to be certain that the matter was handled properly and thoroughly.  Our investigation has been completed and the matter has been addressed with the Attorney General to the satisfaction of the employees involved. Protection of House and Senate employees is of paramount importance to legislative leaders.

[Filing No. 232-9 at 1; Filing No. 232-9 at 13.]

 At 1:30 p.m. on July 2, 2018, the legislative council met and during the meeting, Speaker Bosma approved the joint statement.  [Filing No. 248-17 at 24-25.]  Ten or fifteen minutes after the joint statement had been approved, leadership learned that the *Indianapolis Star* had a copy of the Memorandum.  [Filing No. 248-17 at 25.]  Sometime later that day, Senator Lanane informed Ms. McLemore that the media had obtained a copy of the Memorandum and that it would be published.  [Filing No. 232-4 at 32.]  Subsequently, Senator Long advised Ms. DaSilva that the Memorandum had been obtained by the media and would be made public, and he apologized to her for the unauthorized disclosure.  [Filing No. 232-3 at 45-46; Filing No. 232-10 at 38.]

Attorney General Hill did not hear from leadership about the July 2 meeting until approximately 3:30 p.m. that day, when leadership indicated they were ready to meet with him and his Chief Deputy, Aaron Negangard.  [Filing No. 248-20 at 16; Filing No. 248-21 at 3.]  At the meeting, Speaker Bosma, Senator Long, Representative Goodin, and Senator Lanane reiterated their disapproval of Attorney General Hill's actions and advised that they stood by their employees.

[Filing No. 232-7 at 38; Filing No. 232-8 at 50; Filing No. 232-10 at 27-28; Filing No. 232-10 at 35-36; Filing No. 232-32.]  During the meeting, Attorney General Hill was told that things had gone from bad to worse with the leaking of the Memorandum to the media and that the Memorandum would be printed in the *Indianapolis Star* within a few hours.  [Filing No. 248-20 at 17; Filing No. 248-20 at 21.]  Leadership gave Attorney General Hill the joint statement which stated that the investigation had been completed and the matter had been addressed with Attorney General Hill.  [Filing No. 248-6 at 37-38; Filing No. 248-7; Filing No. 248-21 at 3; Filing No. 249-2.]  At the end of the meeting, Speaker Bosma told Attorney General Hill, "I am really sorry about all of this."  [Filing No. 248-17 at 29.]  Neither Speaker Bosma, Senator Long, Representative Goodin, nor Senator Lanane gave Attorney General Hill a copy of the Memorandum or disclosed the names of any of the complainants or witnesses during the June 29, 2018 telephone call or the July 2, 2018 in-person meeting.  [Filing No. 232-10 at 36-37.]

On July 2, 2018 at 6:27 p.m., the *Indianapolis Star* published its article and released the Memorandum.  [Filing No. 248-26.]  In the Memorandum, Plaintiffs were not identified by name and their pseudonyms were blacked out.  [Filing No. 248-26 at 8-15.]

**H.    The House and Senate Publicly Condemn Attorney General Hill's Inappropriate Conduct, Call for His Resignation, and Request an Investigation by the Indiana Inspector General**

Subsequently, Attorney General Hill issued statements, made comments on social media, and held a press conference in which he called his accusers liars, denied the allegations, and claimed that the allegations were vicious and false.  [Filing No. 248-1 at 45; Filing No. 248-4 at 72; Filing No. 248-27.]  Attorney General Hill, through his attorneys, also threatened to sue for defamation.  [Filing No. 248-27.]  In the meantime, he continued to go to the office that Ms. DaSilva shared with Senator Mishler.  [Filing No. 248-1 at 47-48.]

21

As a result of Attorney General Hill's denials, Speaker Bosma and Senator Long decided to call for Attorney General Hill's resignation. [Filing No. 232-8 at 85-86; Filing No. 232-10 at 49.] Speaker Bosma and Senator Long issued the following statement on July 5, 2018:

> We believe that the women who came forward with accounts of inappropriate behavior by Attorney General Curtis Hill in the early hours of March 15, 2018, are telling the truth regardless of the Attorney General's denial of these allegations. We do not believe that Curtis Hill, as chief law enforcement officer of the State of Indiana, can continue to perform his duties, nor should he, and we call for his immediate resignation. We have further requested that the Indiana Inspector General thoroughly investigate these allegations. Sexual harassment is unacceptable at any time, in any place. It makes no difference that these incidents did not occur in a workplace environment. Curtis Hill is not our employee; if he was, he would already have been fired. Because we cannot terminate his employment, we ask instead for him to own up to his actions, apologize publicly to the victims, and tender his resignation immediately.

[Filing No. 232-9 at 15.]

The Indiana Inspector General's Office conducted an investigation and interviewed Ms. DaSilva, Ms. McLemore, and Ms. Lozano. [Filing No. 232-1 at 31; Filing No. 232-4 at 51.] On July 18, 2018, after private attorneys for Attorney General Hill threatened a defamation lawsuit, Speaker Bosma and Senator Long issued another statement:

> We believe Curtis Hill is the individual who should be answering questions about the allegations of inappropriate conduct, and we stand by our prior statements regarding this matter. We are fully cooperating with the Inspector General's Office as they conduct their current investigation and will await the results.

[Filing No. 232-9 at 17.]

### I. Ms. McLemore and Ms. DaSilva Publish Op-Eds Publicly Identifying Themselves

On July 6, 2018, Ms. McLemore published an op-ed in which she discussed her allegations against Attorney General Hill. [Filing No. 232-28.] In the op-ed, Ms. McLemore stated that she did not request an investigation into Attorney General Hill's conduct and did not need him to resign or receive "a public slogging" as punishment. [Filing No. 232-28 at 2.] She stated:

22

> I want to first say that throughout the investigation – that I did not request but was offered – I did not have a single defined motive.  I didn't need Hill to resign.  I didn't need him to have a public slogging.  I was going through the motions deciding day by day what was best for me.  I just wanted to put my story on record, anonymously, in case it ever came up to bite me in the ass.

[Filing No. 232-28 at 2.]  The op-ed was the first time that Ms. McLemore's name became public as one of the complainants in the Memorandum.  [Filing No. 232-4 at 40.]

Six days later, on July 12, 2018, Ms. DaSilva also published an op-ed which identified her by name for the first time as one of the complainants in the Memorandum.  [Filing No. 232-3 at 47; Filing No. 232-20.]  Ms. DaSilva stated in the op-ed that the Senate did not try to hide its investigation into Attorney General Hill and had maintained the confidentiality of the witnesses as they had requested.  [Filing No. 232-20 at 4.]  She stated:

> When I was interviewed by our caucus leadership, they wanted to know my account of the night as well as what I would like to be done moving forward.  They let me know they would support any decisions I made and would respect my wishes.  I believe our legislative leadership, in all four caucuses, has done just that.
>
> *       *       *
>
> The legislative leadership was not trying to hide the investigation in order to save face.  They were keeping the internal investigation confidential because that was what we, the victims, had asked for.
>
> When the memo was leaked, the House and Senate leaders, who had promised us this confidentiality, were furious, and rightfully so.

[Filing No. 232-20 at 3-4.]  When Ms. DaSilva's identity became known, she began locking her office door every day because she was afraid Attorney General Hill would come in.  [Filing No. 231-3 at 203.]  The Senate purchased her a Ring doorbell for her office several months after Ms. DaSilva reported her fears.  [Filing No. 249-1.]

**J.      The House and the Senate Reiterate Their Support for Plaintiffs**

On October 23, 2018, the Inspector General concluded that Attorney General Hill had not committed a crime or violated any ethical rules.  [Filing No. 248-22.]  Additionally, a court-appointed Special Prosecutor determined not to bring criminal charges against Attorney General Hill.  [Filing No. 232-4 at 51-52.]  Speaker Bosma and Senator Long, however, reiterated their calls for Attorney General Hill to resign.  [Filing No. 232-4 at 52.]  On October 23, 2018, Senator Long issued the following statement:

> I appreciate the thorough work performed by the Inspector General and the Special Prosecutor, and I respect their conclusions.  I believed the women who came forward with reports of misconduct were telling the truth in May, and I believe them now.  The Attorney General's behavior that night toward the women involved is unacceptable.
>
> Hoosiers expect better from the people they elect to represent them in state government, especially when the individual involved is the chief law enforcement officer for the state of Indiana.  I called for the Attorney General to step down in July, and I continue to believe that is the right thing for him to do.  However, it appears that he has no intention to do so, and that is his decision alone to make at this time.  The people of Indiana will have the final say in this matter.

[Filing No. 232-11 at 19.]  Speaker Bosma also maintained his position that Attorney General Hill should resign, despite the findings of the Inspector General and the Special Prosecutor.  [Filing No. 232-9 at 2.]

After the Inspector General and the Special Prosecutor announced their findings, Plaintiffs held a press conference.  [Filing No. 231-1 at 32.]  At the press conference, Ms. Lozano identified herself publicly for the first time as one of the complainants.  [Filing No. 231-1 at 32.]  After the press conference, Ms. Lozano told the Minority Chief of Staff and the staff director that she was not mad at them, and the Minority Chief of Staff responded that Ms. Lozano had a right to do what she had done.  [Filing No. 231-1 at 44.]  The Minority Chief of Staff assured Ms. Lozano that

24

nothing had changed at work, and that if someone treated her differently or if she felt she was being treated differently, she should contact him immediately.  [Filing No. 231-1 at 44.]

The day after the press conference, Ms. Lozano gave an interview to NUVO magazine in which she stated that everyone had been "very supportive," and she was "very happy and very content with [her] decision to come forward publicly."  [Filing No. 232-22 at 2.]  Ms. DaSilva also gave an interview to NUVO magazine, and stated that after her name became public, she felt supported "even within [her] work."  [Filing No. 232-22 at 2.]

**K.    Events Underlying Plaintiffs' Retaliation Claims**

*1.    Ms. Lozano*

In early January 2019, Ms. Lozano attended Latino Advocacy Day at the Statehouse, a legislative event sponsored by the Senate Democrats.  [Filing No. 231-1 at 36.]  While speaking to a table sponsor, Ms. Lozano realized that Attorney General Hill had come to stand beside her so he could also speak to the table sponsor.  [Filing No. 231-1 at 36.]  Ms. Lozano and Attorney General Hill did not exchange words or touch and when Ms. Lozano told her staff director, Alexis Tucker, about the interaction, Ms. Lozano said that she felt uncomfortable and felt that Attorney General Hill was trying to intimidate her.  [Filing No. 231-1 at 35-36; Filing No. 248-5 at 52; Filing No. 248-5 at 56.]  When the House later attempted to investigate Ms. Lozano's claims, the Minority Chief of Staff reiterated that if Ms. Lozano ever felt uncomfortable at a work event, she had permission to leave.  [Filing No. 231-1 at 44.]  Ms. Lozano did not have any other interactions with Attorney General Hill.  [Filing No. 231-1 at 48.]

After Ms. Lozano's identity became known as one of the victims of Attorney General Hill's inappropriate conduct, her work environment completely changed.  [Filing No. 248-5 at 58.]  Staff members started making statements to the effect that there were no more Sine Die Events because

of what had occurred, essentially blaming Ms. Lozano.  [Filing No. 248-5 at 58-61.]  Two legislators made similar comments, and one was also hostile towards Ms. Lozano and blamed her for leaking the Memorandum.  [Filing No. 248-5 at 59; Filing No. 248-5 at 64-65.]  Legislators joked about being careful how they approached or talked to a female staffer.  [Filing No. 248-5 at 68-70.]  Ms. Lozano does not remember reporting any of those comments.  [Filing No. 231-1 at 39-40.]

Ms. Lozano observed that there was not much direct communication with her anymore and that she was not included in meetings she should have attended as the leader's legislative assistant. [Filing No. 248-5 at 60.]  One legislator made Ms. Lozano uncomfortable because he was asking her to dinner and texting her, which she reported to the Chief of Staff many times.  [Filing No. 248-5 at 72-74.]  Although the House claimed that Attorney General Hill was not permitted to attend legislative functions, one representative continued to invite Attorney General Hill to events that he hosted, but Ms. Lozano did not complain to anyone about that.  [Filing No. 248-5 at 73-74.]  Ms. Lozano stopped attending events to which Attorney General Hill was invited, including the state of the state address, and limited her social interactions after the workday.  [Filing No. 248-5 at 75-76; Filing No. 248-5 at 93-99.]

## 2. Ms. DaSilva

At some point after Ms. DaSilva accused Attorney General Hill of misconduct, Senator Karen Tallian put her hand on Ms. DaSilva's back, asked Ms. DaSilva whether she should ask for permission to place her hand there, and said that she should not put her hand there because she did not want to be accused of anything.  [Filing No. 248-1 at 40-41; Filing No. 248-1 at 55.]  Ms. DaSilva did not complain about Senator Tallian's comment to Senate leadership. [Filing No. 232-3 at 60.]

During the summer of 2018, Ms. DaSilva and Ms. McLemore heard that two senators had made comments that Plaintiffs got what they deserved due to the way they were dressed at the Sine Day Event. [Filing No. 232-4 at 42-43.] Neither Ms. DaSilva nor Ms. McLemore heard these statements firsthand or reported hearing about the comments to Senate leadership. [Filing No. 232-4 at 42-43.]

3. *Ms. McLemore*

Sometime in 2019, in front of Ms. McLemore, Representative Phil GiaQuinta joked to Senator Lanane that Senator Lanane wanted to hurry and leave to get to AJ's Lounge. [Filing No. 232-4 at 17.] Senator Lanane jokingly responded that he only wanted to attend if Attorney General Hill was going to be there. [Filing No. 232-4 at 17.] When he learned that Ms. McLemore had been involved in the events at the Sin Die Event, Representative GiaQuinta apologized to Ms. McLemore, and she accepted his apology. [Filing No. 232-4 at 45.] The day after the 2019 legislative session ended, the topic was brought up again on "Indiana Lawmakers" by John Schwantes, the host. [Filing No. 248-4 at 17.] Ms. McLemore also learned from either a co-worker or her Chief of Staff that two senators were discussing what occurred at the Sine Die Event and one stated that Plaintiffs got what they deserved because of how they were dressed. [Filing No. 248-4 at 74-75.]

When Ms. McLemore attended an Indiana Senate Democratic Caucus meeting before either the 2019 or 2020 legislative session, she overheard Senator Taylor taking issue with a negative depiction of the men present at AJ's Lounge at the Sine Die Event. [Filing No. 248-4 at 77-80; Filing No. 232-4 at 18.] Senator Taylor quoted an article from the *Indianapolis Star* and then stated that it was turning into an exposé on the men that were at the Sine Die Event who did nothing about Attorney General Hill's behavior. [Filing No. 248-4 at 80-81.] Ms. McLemore

limited her attendance at work-related social events because of the negative, uncomfortable, or inappropriate reactions of legislators and staff following her complaints about Attorney General Hill.  [Filing No. 248-4 at 103-04.]

**L.    Plaintiffs Initiate This Litigation**

On June 18, 2019, Plaintiffs filed this lawsuit alleging claims for sexual harassment and retaliation under Title VII, sexual harassment and discrimination under the Equal Protection Clause, and retaliation under 42 U.S.C. § 1983 against the State of Indiana, as well as various claims against Attorney General Hill.  [Filing No. 1.]

**M.    The House and the Senate Investigate Plaintiffs' Retaliation Claims**

*1.     The House and Ms. Lozano's Claims*

On July 1, 2019, after becoming aware that Plaintiffs had filed their Complaint in this case, House Democrat Chief of Staff Graham Fishell, Chief Counsel for the House Republicans Noelle Sykes, and Director of Legislative Affairs Alexis Tucker met with Ms. Lozano about the Latino Advocacy event that had occurred in January 2019.  [Filing No. 248-5 at 86.]  Ms. Lozano told Mr. Fishell that she wanted her attorneys present during the conversation.  [Filing No. 248-5 at 87.]  The Minority Chief of Staff reiterated to Ms. Lozano that if she ever felt uncomfortable at a required work event, she could leave.  [Filing No. 231-1 at 44.]  The Minority Chief of Staff also asked Ms. Lozano to bring any issues to his attention if they occurred in the future.  [Filing No. 231-10 at 19.]  The Minority Chief of Staff and Majority Chief Counsel each asked Ms. Lozano if there were any other incidents of which they should be aware, but Ms. Lozano refused to speak about them on advice from her attorney.  [Filing No. 231-1 at 44-45.]

>    2.    *The Senate and Ms. DaSilva's and Ms. McLemore's Claims*

On June 28, 2019, Senate Republican Chief of Staff Jeff Papa and Senate Secretary Jennifer Mertz met with Ms. McLemore to follow up on allegations contained in this lawsuit that she had not previously disclosed to Senate leadership.  [Filing No. 232-4 at 46.]  More than once, Ms. McLemore asked that one of her attorneys be present, and Mr. Papa told her that she did not need an attorney.  [Filing No. 248-4 at 88; Filing No. 248-4 at 95-96.]  Ms. McLemore repeated her request for one of her attorneys to be present many times until she felt like there was no way of getting out of the conversation.  [Filing No. 248-4 at 96.]  Ms. McLemore felt that she had no choice but to answer Mr. Papa's questions because of his position as Chief of Staff for the Senate Republicans.  [Filing No. 248-4 at 88.]  Ms. McLemore answered questions regarding Senator Taylor's comment, Representative GiaQuinta's comment, and the comment made by Mr. Schwantes on "Indiana Lawmakers," and Ms. McLemore said she had nothing else to report at that time.  [Filing No. 232-4 at 46-48.]

The same day, Mr. Papa and Ms. Mertz met with Ms. DaSilva regarding allegations contained in this lawsuit that she had not previously disclosed to Senate leadership.  [Filing No. 232-3 at 68; Filing No. 232-12 at 14; Filing No. 232-24 at 1-2.]  Ms. DaSilva stated that she did not wish to discuss her allegations until she had spoken with her attorneys and, after speaking to her attorneys, she refused to discuss the allegations in this lawsuit.  [Filing No. 232-3 at 68; Filing No. 232-24 at 1-2.]  Ms. DaSilva felt intimidated and uncomfortable and was repeatedly asked to talk about the allegations in the Complaint without her attorney being present.  [Filing No. 248-1 at 71-73.]

Mr. Papa then interviewed the individuals involved in Ms. DaSilva's and Ms. McLemore's allegations, advised them that retaliation was not tolerated, and, regardless of whether they

29

admitted to the allegations, warned them that the alleged behavior was inappropriate.  [Filing No. 232-12 at 13; Filing No. 232-12 at 21-25; Filing No. 232-12 at 27-37; Filing No. 232-12 at 40-44; Filing No. 232-33.]

### N.   Plaintiffs Continue Their Employment Without Incident

At the beginning of 2019 – approximately seven months after Ms. Lozano reported Attorney General Hill's conduct at the Sine Die Event to House leadership – the House promoted Ms. Lozano to Assistant to the House Democratic Caucus Chair, which resulted in a pay increase. [Filing No. 231-1 at 16.]  At the end of 2020, Ms. Lozano was promoted to Assistant to the House Minority Leader, Representative GiaQuinta, resulting in another pay increase.  [Filing No. 231-1 at 15-16.]  Ms. Lozano resigned her employment, effective June 18, 2021, for a position with Indiana American Water, which resulted in a significant increase in her annual earnings.  [Filing No. 231-1 at 17.]  Upon her resignation, Ms. Lozano wrote that she would "miss working with the [Democratic Chief of Staff] and many of [her] colleagues and members," as her "employment with [the House] over the course of the last four years ha[d] been an opportunity to both learn and to contribute," and she would "take many of the positive and character building experiences to [her] new employment."  [Filing No. 231-23 at 1.]

After the Sine Die Event, Ms. DaSilva's performance reviews remained positive and she continued to receive raises.  [Filing No. 232-3 at 65.]  Ms. DaSilva resigned her employment in August 2019 to work for the United States Chamber of Commerce Foundation and received a salary increase.  [Filing No. 232-3 at 20; Filing No. 232-3 at 29; Filing No. 232-19.]  After her resignation, Ms. DaSilva posted a LinkedIn endorsement for the Senate internship program in which she stated: "Interning and then working for the #Indiana State Senate was one of the most rewarding times in my professional and personal career.  (Take my word for it, really, see video

below)." [Filing No. 232-21.]   Recently, Ms. DaSilva expressed interest in learning about a position with the Senate as a fiscal analyst.  [Filing No. 232-3 at 67.]

Approximately a month after the Sine Die Event, the Senate promoted Ms. McLemore to Director of Communications for the Indiana Senate Democratic Caucus, and she continued to receive periodic pay raises.  [Filing No. 232-4 at 15-16.]  Ms. McLemore continued to work for the Senate and resigned effective February 7, 2020 to work for Tamm Capital Group.  [Filing No. 232-4 at 16.]  She resigned in part because her co-workers and legislators continued to bring up Attorney General Hill's inappropriate conduct at the Sine Die Event.  [Filing No. 232-4 at 16-17.]

### O.     Attorney General Hill Is Disciplined and Loses His Re-Election Bid

Following a disciplinary proceeding, the Indiana Supreme Court found that Attorney General Hill had committed criminal battery and behaved unethically and suspended his law license for thirty days.  [Filing No. 248-28.]  He was not nominated to run for re-election, and his term as Indiana Attorney General ended in January 2021.

### P.     The Operative Complaint

After the Court ruled on Motions to Dismiss filed by the State of Indiana and Attorney General Hill, [Filing No. 113], Plaintiffs filed the operative Second Amended Complaint, [Filing No. 115].  In their Second Amended Complaint, they assert claims against the House and the Senate for hostile work environment and retaliation under Title VII.  [Filing No. 115.][5]  The House and the Senate have now moved for summary judgment on all of Plaintiffs' claims.  [Filing No. 231; Filing No. 232.]

---

[5] Plaintiffs also named Attorney General Hill as a Defendant in the Second Amended Complaint, and set forth claims for battery, defamation, and false light invasion of privacy.  [Filing No. 115.] The Court dismissed the claims against Attorney General Hill without prejudice for lack of subject-matter jurisdiction.  [Filing No. 134.]  Consequently, Attorney General Hill is no longer a party to this lawsuit and Plaintiffs pursued those claims in state court.

# III.

## DISCUSSION

At the outset, the Court finds – and the parties do not dispute – that Ms. Lozano only asserts claims against the House, and that Ms. DaSilva and Ms. McLemore only assert claims against the Senate.  The Court addresses the two Motions for Summary Judgment in turn below, but notes that there is a great deal of overlap with the parties' arguments so combines its discussion accordingly. The Court also readily acknowledges the seriously inappropriate conduct of Attorney General Hill – a point on which the parties agree as well.  There is no dispute that Attorney General Hill's conduct toward Plaintiffs was abhorrent and unwelcome.  But his liability is not the question in this litigation.  Instead, the Court must consider whether Plaintiffs' employers are liable for their actions in response to reports of that conduct.  It is through the lens of liability for the House and Senate as employers that the Court will view the pending motions.

### A.      Hostile Work Environment Claims

Title VII prohibits employers from discriminating against employees based on their gender. 42 U.S.C. § 2000e-2(a)(1).  Hostile or abusive work environments are forms of sex discrimination actionable under Title VII.  *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 812 (7th Cir. 2022) (quoting *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008)).  Under Title VII, a work environment is hostile "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotation and citation omitted).  In order to prove a hostile work environment claim, a plaintiff must show that: "(1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability."  *Scaife v. U.S. Dep't of Veterans*

32

*Affs.*, 49 F.4th 1109, 1115-16 (7th Cir. 2022) (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)).   The House and Senate argue that Attorney General Hill's conduct was neither severe nor pervasive and that, even if it was, they responded appropriately so there is no basis for their liability as Plaintiffs' employers.   The Court addresses each argument in turn.

### 1.      Whether the Conduct Was Severe or Pervasive

In support of their Motions for Summary judgment, Defendants argue that the conduct Plaintiffs rely upon for their hostile work environment claims "falls well short of the objectively severe or pervasive standard required for a claim of harassment against [Defendants]."  [Filing No. 233 at 21; Filing No. 236 at 25.]  They argue that the conduct occurred outside the workplace at "an informal social gathering and involved a harasser who is neither a supervisor nor a co-worker of [Plaintiffs]."  [Filing No. 233 at 21; Filing No. 236 at 25.]  Defendants contend that Attorney General Hill's conduct was not physically threatening and only happened once, and that Plaintiffs did not interact with Attorney General Hill as part of their regular job duties and did not have any other inappropriate contact with Attorney General Hill.  [Filing No. 233 at 21; Filing No. 236 at 25-26.]  Defendants argue that Attorney General Hill's conduct "did not unreasonably interfere with [Plaintiffs'] work performance," and that the House promoted Ms. Lozano twice (including once after she reported Attorney General Hill's conduct and once after this lawsuit was filed), Ms. DaSilva's performance reviews continued to be positive, and Ms. McLemore was promoted to Director of Communications for the Senate Democrats a month after the Sine Die Event.  [Filing No. 233 at 21; Filing No. 236 at 25-26.]  Defendants rely upon cases where the Seventh Circuit "rejected hostile work environment claims based on conduct more severe or pervasive than the alleged conduct at issue," and contend that Attorney General Hill's conduct was not "severe enough

to trigger liability for [Defendants] as [Plaintiffs'] employer[s]."  [Filing No. 233 at 21-22; Filing No. 236 at 26-27.]

In response, Plaintiffs argue that they do not need to demonstrate that Attorney General Hill's conduct was both severe and pervasive, and that even one act of harassment can suffice if it is egregious.  [Filing No. 252 at 26-27; Filing No. 253 at 26-27.]  They point to Attorney General Hill's actions at the Sine Die Event, and assert that Ms. Lozano was "uncomfortable and disturbed" by Attorney General Hill's conduct, that Ms. DaSilva was "shocked, uncomfortable, angry, [and] embarrassed," and that Ms. McLemore "ran into the bathroom and cried and then left the event and continued crying."  [Filing No. 252 at 27-28; Filing No. 253 at 27-29.]  They argue that "[e]vidence of harassment of other women[] may be considered in evaluating a hostile work environment claim," and note that: Ms. DaSilva witnessed Ms. Lozano "being visibly uncomfortable next to the Attorney General and stepped in between them to help her"; "[f]rom the moment [Ms.] Lozano arrived at the Sine Die Event, she was affronted by witnessing the Attorney General touch and grope her boss, Representative Reardon, which was distressing"; Attorney General Hill "acted inappropriately with several other females, including, but not limited to Representative Reardon, Laura McCaffrey, Laura Johnson, and Laura Brown" at the Sine Die Event; and Donna Smith "also observed [Attorney General Hill] rubbing against any females that passed by."  [Filing No. 252 at 28-29; Filing No. 253 at 29.]

In reply, Defendants argue that Plaintiffs cannot rely on Attorney General Hill's conduct toward others at the Sine Die Event because Ms. DaSilva and Ms. McLemore did not observe that conduct, and Ms. Lozano only observed Attorney General Hill's interaction with Representative Reardon.  [Filing No. 258 at 9; Filing No. 259 at 6.]  They assert that even if Plaintiffs could rely upon that conduct, it still was not severe or pervasive, noting that the conduct took place

"afterhours at a voluntary social event in a public bar," and distinguishing cases cited by Plaintiffs.
[Filing No. 258 at 10-11; Filing No. 259 at 7-8.]

In determining whether conduct is severe or pervasive, the Seventh Circuit directs the Court to consider the totality of the circumstances, including: "(1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim." *Scaife*, 49 F.4th at 1116 (citing *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013)). "[E]mployers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018) (citation omitted). Additionally, "occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers generally does not create a work environment that a reasonable person would find intolerable." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002) (quotation and citation omitted).

Plaintiffs rely on the following conduct, all of which occurred at the Sine Die Event, to support their argument that Attorney General Hill's conduct was severe or pervasive:

- Ms. Lozano

  o Attorney General Hill told Ms. Lozano that she was hot;

  o Attorney General Hill put his arm around Ms. Lozano's waist and pulled her into him;

  o Ms. Lozano witnessed Attorney General Hill touch and grope Representative Reardon; and

  o Attorney General Hill acted inappropriately with other women, but Ms. Lozano did not witness that conduct.

- Ms. DaSilva

  o Attorney General Hill put his arm around Ms. DaSilva and other females, and told them that they had to show a little skin to get a drink;

  o Attorney General Hill put his hand on Ms. DaSilva's back and when Ms. DaSilva tried to move Attorney General Hill's hand, he grabbed it and pulled her hand and arm down with his and touched her butt, and then stood there staring at her and smirking;

  o Ms. DaSilva witnessed Ms. Lozano being visibly uncomfortable next to Attorney General Hill and stepped in between them to help Ms. Lozano; and

  o Attorney General Hill acted inappropriately with other women, but Ms. DaSilva did not witness that conduct.

- Ms. McLemore

  o While sitting at the bar with a co-worker, Attorney General Hill pulled up a bar stool and put his hand on Ms. McLemore's back and began rubbing her entire back, up and down, slowly; and

  o Attorney General Hill acted inappropriately with other women, but Ms. McLemore did not witness that conduct.

[Filing No. 252 at 27-28; Filing No. 253 at 27-28.]

The Court considers the factors set forth by the Seventh Circuit in *Scaife*. First, the acts upon which Plaintiffs base their hostile work environment claims all took place on one evening at the Sine Die Event – an event that was an informal gathering, outside of the workplace, and after working hours. The acts did not occur over a period of time and, indeed, there is no evidence that any of the Plaintiffs had any one-on-one encounters with Attorney General Hill thereafter. While Ms. Lozano saw Attorney General Hill at a Latino Advocacy Day event in early January 2019, there is no evidence that Attorney General Hill acknowledged Ms. Lozano in any way, despite standing beside her so that he could speak to someone nearby – indeed, the evidence shows that they did not exchange words or touch. The frequency of the offensive conduct – which took place

36

at one event, and not over a period of time – does not support a finding that the conduct was severe or pervasive. *See Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 851 (7th Cir. 2019) ("A hostile work environment occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.") (quotation and citation omitted).

Second, while Attorney General Hill's conduct toward Plaintiffs was offensive to be sure, Seventh Circuit precedent warrants the conclusion that it was not offensive enough to be actionable under Title VII. *See, e.g.*, *Davis v. Papa John's USA, Inc.*, 2021 WL 5154105, at *2 (7th Cir. 2021) (holding that "an isolated touch on the shoulder and one crude insult are not objectively severe or pervasive enough to be actionable under Title VII"). In fact, the Seventh Circuit has found that conduct that was objectively more offensive than that displayed by Attorney General Hill at the Sine Die Event was not actionable under Title VII. *See, e.g.*, *Swyear*, 911 F.3d at 879 (co-worker touched plaintiff's arm and lower back, invited her to go skinny dipping, and climbed into plaintiff's hotel bed and asked her to cuddle); *McPherson v. City of Waukegan*, 379 F.3d 430, 434-35 (7th Cir. 2004) (plaintiff's supervisor asked her what color bra she was wearing, asked if he could "make a house call," and pulled back her tank top so he could see her bra); *Hilt-Dyson*, 282 F.3d at 463-64 (supervisor rubbed plaintiff's back, squeezed her shoulder and stared at her chest, and told her to raise her arms and open her blazer during a uniform fitting).

Third, Attorney General Hill's conduct was both verbal (telling Ms. Lozano that she was hot and telling Ms. DaSilva she needed to show a little skin to get a drink) and physical (touching Ms. Lozano's waist and giving her a side hug; putting his arm around Ms. DaSilva and putting his hand on her back and touching her butt; and putting his hand on Ms. McLemore's back and rubbing her entire back). Further, after her interaction with Attorney General Hill at the Sine Die Event,

37

Ms. Lozano began locking her office door.  The Court acknowledges that Plaintiffs were humiliated by Attorney General Hill's conduct, and that Ms. Lozano felt threatened.

Fourth, Attorney General Hill's conduct did not unreasonably interfere with Plaintiffs' job performance.  While they all spent time discussing their interactions with Attorney General Hill with House and Senate leadership, they ultimately did not complain about further contacts with Attorney General Hill (other than Ms. Lozano complaining about seeing Attorney General Hill at the Latino Advocacy Day event).

Ms. Lozano stated that she was satisfied with the outcome of the investigation and appreciated how the situation was handled.  She was also promoted twice after she reported Attorney General Hill's misconduct – once after she filed this lawsuit.  While she faced comments from co-workers about the fact that there were no more Sine Die Events, received texts from a House member inviting her to dinner, and perhaps was not invited to meetings she otherwise would have attended, these incidents made her uncomfortable but did not affect her work performance. Indeed, she voluntarily left her position in June 2021 for a higher paying job.

Ms. DaSilva received positive performance reviews after the Sine Die Event, continued to receive raises, voluntarily resigned her employment for another position at which she received a salary increase, posted a LinkedIn endorsement for the Senate internship program, and recently expressed interest in learning about a position with the Senate as a fiscal analyst.  As with Ms. Lozano, while she felt uncomfortable after she came forward regarding Attorney General Hill's misconduct, she has not presented any evidence that her work performance was affected.

Ms. McLemore was promoted to Director of Communications at the Senate approximately one month after the Sine Die Event and continued to receive periodic pay raises.  She worked for the Senate until February 2020, when she voluntarily resigned to work for a private company.

38

While Ms. McLemore claims that she resigned in part because her co-workers and legislators continued to bring up Attorney General Hill's inappropriate conduct at the Sine Die Event, there is no evidence that her work performance was affected.

Finally, Plaintiffs' own interactions with Attorney General Hill were limited to his comments and isolated physical touching. While "there is no magic number of incidents required to establish a hostile environment," *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007), Plaintiffs' limited direct interactions with Attorney General Hill at the Sine Die Event are not severe or pervasive enough to support a hostile work environment claim. As for their observation of Attorney General Hill's conduct toward other women at the Sine Die Event, the impact of "second-hand" harassment is "obviously not as great as the impact of harassment directed at the plaintiff." *Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001) (quotation and citation omitted). And Plaintiffs cannot point to Attorney General Hill's treatment of other women that they did not observe to bootstrap the impact of the treatment they faced themselves. *See Yuknis v. First Student, Inc.*, 481 F.3d 552, 555-56 (7th Cir. 2007) ("Offense based purely on hearsay or rumor really is 'second hand'; it is less credible, and, for that reason and also because it is less confrontational, it is less wounding than offense based on hearing or seeing…. The American workplace would be a seething cauldron if workers could with impunity pepper their employer and eventually the EEOC and the courts with complaints of being offended by remarks and behaviors unrelated to the complainant except for his having overheard, or heard of, them.").

In short, although there is no doubt that Plaintiffs were humiliated by Attorney General Hill's "creepy" conduct and perhaps even felt threatened by it, Plaintiffs have not presented evidence from which a reasonable jury could conclude that Attorney General Hill's conduct was

so severe or pervasive as to create a hostile work environment that is actionable under Title VII and Circuit precedent.  Even so, the Court considers whether even if Plaintiffs had shown that Attorney General Hill's conduct was severe or pervasive, there is a basis for employer liability.

2.      *Whether There Is a Basis for Employer Liability*

In support of their Motion for Summary Judgment, Defendants argue that even if Plaintiffs experienced actionable harassment, Defendants took prompt corrective action including immediately launching an investigation, interviewing Plaintiffs, and engaging outside counsel. [Filing No. 233 at 23; Filing No. 236 at 28.]  Specifically, Defendants assert that they: warned Attorney General Hill that his alleged conduct was unacceptable, instructed him to refrain from any contact with legislative staff members, and prohibited him from attending legislative gatherings; asked Plaintiffs to tell them if Attorney General Hill ever contacted them or made them uncomfortable; and called on the Inspector General to conduct an investigation.  [Filing No. 233 at 23; Filing No. 236 at 28.]  The House notes that it confirmed that Ms. Lozano did not interact with Attorney General Hill as part of her regular job duties.  [Filing No. 233 at 23.]  Defendants argue that they "took prompt and appropriate corrective action that was reasonably likely under the circumstances to (and, in fact, did) prevent any alleged sexual harassment from recurring," and note that their ability to impose corrective action was limited by the fact that Attorney General Hill was an elected official from a separate branch of government who, by statute, had to be present in the Statehouse.  [Filing No. 233 at 23-24; Filing No. 236 at 28-29.]

Plaintiffs argue in response that a reasonable jury could conclude that Defendants did not take reasonable corrective action because Defendants should have known of Attorney General Hill's sexual harassment on March 15, 2018, in April 2018, and on May 14, 2018, but "responded ineffectually."  [Filing No. 252 at 30; Filing No. 253 at 30.]  They argue that multiple legislators

observed Attorney General Hill's inappropriate conduct towards Plaintiffs and other females at the Sine Die Event, that even more House and Senate members became aware of that conduct at the Black Caucus town hall meeting in April 2018, and that when Representative Reardon reported Attorney General Hill's conduct on May 14, 2018, the only thing Defendants did was to speak with Plaintiffs and two other House staffers to ask them what had occurred at the Sine Die Event. [Filing No. 252 at 30-32; Filing No. 253 at 31-32.]  Plaintiffs assert that Defendants only hired outside counsel to provide an opinion as to Defendants' liability, and not to investigate Attorney General Hill's conduct.  [Filing No. 252 at 32; Filing No. 253 at 32.]  Plaintiffs note that when Defendants spoke to Attorney General Hill six weeks after speaking with Plaintiffs, it was to notify him that Defendants had learned that the *Indianapolis Star* was writing a story about his conduct at the Sine Die Event, so that he would not be blindsided.  [Filing No. 252 at 32-33; Filing No. 253 at 33.] Plaintiffs assert that at the end of the July 2, 2018 meeting with Attorney General Hill, Speaker Bosma apologized to Attorney General Hill and that the meeting "had nothing to do with the Plaintiffs' complaints about [Attorney General Hill] and everything to do with minimizing any fallout from the media coverage."  [Filing No. 252 at 33; Filing No. 253 at 33-34.]

In reply, Defendants argue that they did not have constructive knowledge of Plaintiffs' interaction with Attorney General Hill at the Sine Die Event because it is undisputed that Ms. Lozano did not disclose the interaction until April 14, 2018, when she had lunch with Representative Reardon; there is no evidence that Senator Mishler saw or heard about Ms. DaSilva's interactions with Attorney General Hill at the Sine Die Event; and that any evidence that Senator Taylor saw Ms. McLemore's interaction with Attorney General Hill at the Sine Die Event is either inadmissible or does not show that he knew she was being subjected to workplace harassment.  [Filing No. 258 at 11; Filing No. 259 at 9-10.]  Defendants also assert that there is no

evidence that various representatives or senators observed Plaintiffs' interactions with Attorney General Hill and that, even if they had, Plaintiffs "provide[ ] no legal basis to impute [their] knowledge to [Defendants, which are] constitutionally separate legislative chamber[s]." [Filing No. 258 at 12; Filing No. 259 at 9.] Defendants argue that they responded appropriately to the accusations, and that Representative Reardon attempted to find out if Ms. Lozano wanted to take action on the allegations and to determine the best avenue for raising the issue, and Ms. Lozano "cannot hold the House responsible for the time it took to respond, when she knowingly avoided reporting her claims through the proper channel." [Filing No. 258 at 13.] They contend that once Senator Breaux learned of Ms. McLemore's and others' allegations in April 2018, she offered to assist Ms. McLemore but Ms. McLemore initially resisted, and that she also cannot hold the Senate responsible for a delay when she avoided reporting her claims. [Filing No. 259 at 11.] Defendants argue that there is no evidence that the Senate knew of Ms. DaSilva's allegations until she reported them to Senator Mishler on May 14, 2018. [Filing No. 259 at 12.] They note that Plaintiffs and Attorney General Hill interacted at an informal party at a public bar, that Attorney General Hill was not a supervisor or co-worker of Plaintiffs, that Plaintiffs did not interact with Attorney General Hill in their jobs, and that no harm occurred during the time it took for Representative Reardon to "assess the proper response" to Ms. Lozano's accusations or during the time it took Senator Breaux to convince Ms. McLemore to participate in the investigation. [Filing No. 258 at 13; Filing No. 259 at 11.] Defendants argue further that Plaintiffs' assertions that Defendants' investigation and actions were only a response to media fallout, and that Defendants engaged legal counsel only to provide an opinion on liability, are not support by the evidence. [Filing No. 258 at 14-16; Filing No. 259 at 12-14.] Finally, Defendants assert that Plaintiffs did not face any further harassment from Attorney General Hill after they reported their interactions at the Sine Die

42

Event, and that Plaintiffs do not identify any other actions Defendants could or should have taken. [Filing No. 258 at 15-16; Filing No. 259 at 14-15.]

An employer is not liable for harassment from a co-worker where it "takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009). "Employers satisfy their obligation under Title VII when they take steps reasonably calculated to prevent future harassment, even if those steps fail to prevent all contact between the employees." *Kemp v. Kickert School Bus Lines, Inc.*, 2022 WL 1768842, at *2 (7th Cir. June 1, 2022). "To prove negligence, an employee usually must make a concerted effort to inform the employer that a problem exists," such as "lodging a complaint with human resources or telling high-level management about the harassment." *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 931 (7th Cir. 2017) (quotations and citations omitted). "[A]n employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty…to alert the employer to the allegedly hostile environment." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 638 (7th Cir. 2009) (quotation and citation omitted). "In assessing the corrective action, [the] focus is not whether the perpetrator[ was] punished by the employer, but whether the employer took reasonable steps to prevent future harm." *Id.* at 637.

The undisputed facts establish the following timeline of events:

- Plaintiffs tell co-workers about their interactions with Attorney General Hill at the Sine Die Event in the days after the event, but do not report it to leadership;

- A few weeks after the Sine Die Event, Senator Taylor apologizes to Ms. McLemore for not doing anything in response to Attorney General Hill's conduct toward at the Sine Die Event, which he apparently observed;

- In April 2018, the month after the Sine Die Celebration, Senator Breaux questions Ms. McLemore about her interactions with Attorney General Hill at the Sine Die Event and suggests that Ms. McLemore report it to Senate leadership but Ms. McLemore resists and states that she will think about it.  Ms.

43

McLemore also tells her Chief of Staff about it, who offers to assist Ms. McLemore in reporting it;

- A week later, Ms. McLemore advises Senator Breaux that she is ready to report Attorney General Hill's inappropriate conduct at the Sine Die Event, and meets with Senate leadership shortly thereafter;

- Also in April 2018, Ms. Lozano tells Representative Reardon about her interactions with Attorney General Hill at the Sine Die Event, and Representative Reardon tells Ms. Lozano that she wants to inform leadership;

- On May 14, 2018, the General Assembly reconvenes for a special legislative session and leadership, including Speaker Bosma, learn of Attorney General Hill's inappropriate conduct at the Sine Die Event for the first time.  Speaker Bosma informs leadership, including Senators Long and Lanane and Representative Goodin, and they collectively decide to launch an investigation. Ms. DaSilva tells Senator Mishler about Attorney General Hill's misconduct and Representative Reardon tells Representative Goodin and they meet with Speaker Bosma;

- On May 15, 2018, House and Senate leadership speak to Ms. Lozano and two other House staffers, and the House Chief Counsel and Principal Clerk interview Ms. Lozano.  Ms. DaSilva and Ms. McLemore also meet with Senate leadership regarding Attorney General Hill's misconduct;

- Around this time, the House and Senate engage outside counsel;

- On June 18, 2018, outside counsel advises in the Memorandum that the General Assembly had conducted a prompt and effective investigation and that Attorney General Hill's conduct did not constitute sexual harassment in violation of Title VII;

- On June 29, 2018, Speaker Bosma and Senator Long learn of the planned *Indianapolis Star* article and arrange to speak with Attorney General Hill via telephone that day, and during the conversation they admonish him that his behavior was inappropriate and unacceptable, that he is to have no interaction with any of the Senate's or House's employees, that he is not to retaliate, that he is not to attempt to identify the individuals who reported his actions, and that he is not permitted to attend any legislative gatherings;

- On July 2, 2018, Speaker Bosma asks Ms. Lozano to let him or Representative Goodin know if Attorney General Hill contacts her or makes her uncomfortable. Senator Long asks the same of Ms. McLemore and Ms. DaSilva.  Senator Long also informs Ms. McLemore and Ms. DaSilva that Defendants had retained outside counsel and that they would keep the Memorandum confidential. Senator Long subsequently advises Ms. DaSilva that the Memorandum has

been leaked.  House and Senate leadership release a joint statement regarding the investigation.  Later that day, House and Senate leadership meet with Attorney General Hill and reiterate their disapproval of his actions, advise that they stand by their employees, and Speaker Bosma apologizes to Attorney General Hill "about all of this."  That evening, the *Indianapolis Star* releases the Memorandum, which does not disclose Plaintiffs' names;

- Subsequently, Attorney General Hill issues statements denying the allegations and calling his accusers liars;

- On July 5, 2018, Speaker Bosma and Senator Long issue a statement calling for Attorney General Hill's resignation;

- The Indiana Inspector General's Office conducts an investigation and interviews Plaintiffs;

- On July 6, 2018 and July 12, 2018, Ms. McLemore and Ms. DaSilva, respectively, publish op-eds identifying themselves as victims of Attorney General Hill's misconduct;

- On July 18, 2018, Speaker Bosma and Senator Long issue another statement standing by prior statements and stating that they are fully cooperating with the Inspector General;

- On October 23, 2018, the Inspector General concludes that Attorney General Hill has not committed a crime or violated any ethical rules and a court-appointed Special Prosecutor determines not to bring criminal charges against him.  The same day, Senator Long issues a statement reiterating support for Plaintiffs and again calling for Attorney General Hill's resignation but noting that Attorney General Hill has no intention of resigning and that the people of Indiana will have the final say.

This undisputed timeline of events establishes that Defendants reasonably responded to Plaintiffs' complaints regarding Attorney General Hill's inappropriate conduct.  Plaintiffs did not report Attorney General Hill's conduct right away and even assuming that others observed that conduct, Plaintiffs have not provided any legal authority that would impute those observations to House or Senate leadership.  Instead, the obligation to respond to the misconduct was triggered, at the earliest, on May 14, 2018 – when Representative Reardon reported the misconduct to Speaker Bosma and other House leadership and Speaker Bosma alerted Senate leadership.  That report set

in motion a prompt investigation, which included interviewing Plaintiffs, engaging outside counsel, and confronting Attorney General Hill, admonishing him, and instructing him that he was to have no interaction with House or Senate employees, was not to retaliate, and was not to try to identify who his accusers were.   Defendants also maintained the confidentiality of Plaintiffs' identity, told Ms. Lozano she could leave work-related events if she felt uncomfortable, told Plaintiffs to let leadership know if they had further contact with Attorney General Hill or felt uncomfortable, and issued public statements in support of Plaintiffs when the Memorandum was leaked and when Attorney General Hill declared his innocence and called his accusers liars.   Less than two months after learning of Attorney General Hill's misconduct, and just a few weeks after outside counsel had issued the results of its investigation, Defendants called for Attorney General Hill's resignation.

The Court is not sure what more Defendants could have done, and Plaintiffs do not suggest any further action that Defendants should have taken.   Significantly, Attorney General Hill was not a House or Senate employee, and Defendants were powerless to remove him from the office to which he was elected.[6]   Further, and most tellingly, it is undisputed that Plaintiffs did not have

---

[6] In affirming the Court's dismissal of Plaintiffs' original claims against the State of Indiana and Attorney General Hill in this case, the Seventh Circuit stated in dicta that the House and Senate "had some potential control" over Attorney General Hill because "[t]he senior legislative officer at the party could have ejected Hill, an interloper.   And the legislature holds the impeachment power, which could oust an Attorney General from office." *DaSilva*, 30 F.4th at 674-75.   As for ejecting Attorney General Hill from the Sine Die Event, there is no evidence regarding who the most senior legislative officer at the event was, or whether he or she observed or was made aware of Attorney General Hill's conduct.   As for impeachment, the Court notes that Indiana Code § 5-8-1-1 provides that "all state officers other than justices of the supreme court or judges of the court of appeals of Indiana or the Indiana tax court, all other judges, prosecuting attorneys, and all county, city, town, and township officers are liable to impeachment for *any misdemeanor in office...*" (emphasis supplied).   Given the Special Prosecutor's determination not to bring criminal charges against Attorney General Hill, the Court is doubtful that Attorney General Hill could have been impeached.

any further contact with Attorney General Hill after the Sine Die Event, other than when Attorney General Hill stood beside Ms. Lozano at the Latino Advocacy Day event, but did not say anything to her or touch her.  In determining whether an employer reasonably responded to a claim of harassment, "[t]he emphasis is on the prevention of future harm," *Lapka*, 517 F.3d at 984 – here, Defendants' response ensured that future harm did not occur, and it in fact did not occur.  The Court finds that no reasonable jury could find that Defendants were negligent in preventing future harassment from occurring.[7]

In sum, the Court finds that no reasonable jury could conclude that Attorney General Hill's conduct at the Sine Die Event was sufficiently severe or pervasive or that Defendants failed to reasonably respond to that conduct.  Accordingly, the Court **GRANTS** Defendants' Motions for Summary Judgment, [Filing No. 231; Filing No. 232], as to Plaintiffs' hostile work environment claims.

---

[7] Plaintiffs make much of their contentions that: (1) Defendants retained outside counsel not to investigate Attorney General Hill's conduct, but to give an opinion as to Defendants' liability as employers; (2) Speaker Bosma and Senator Long moved their initial meeting with Attorney General Hill up to June 29, 2018 to give him a "heads up" about the planned *Indianapolis Star* article; and (3) Speaker Bosma apologized to Attorney General Hill at the July 2, 2018 meeting. First, the Court does not find Defendants' motivation for hiring outside counsel significant.  Even if Defendants' goal was to ensure that they did not face liability, that would mean that they were acting in accordance with the law – which is what Plaintiffs should have wanted them to do. Second, the reason for moving the meeting up because of the planned *Indianapolis Star* article is irrelevant to the Court's analysis, but the Court notes that other evidence shows that leadership admonished Attorney General Hill during the meeting, instructed him to have no contact with House or Senate employees, and ordered him not to attend legislative events – a valid reason to have the meeting as soon as possible.  Finally, Speaker Bosma testified that he apologized to Attorney General Hill at the end of the July 2, 2018 meeting because Attorney General Hill is married with children, and the news of his misconduct was about to be made public.  [Filing No. 248-17 at 29.]  The apology does not undermine the reasonableness of Defendants' response.

### B.      Retaliation Claims

In support of their Motions for Summary Judgment, Defendants argue that Plaintiffs' retaliation claims fail because they reasonably responded to Attorney General Hill's misconduct. [Filing No. 233 at 25; Filing No. 236 at 30.] They characterize Plaintiffs' retaliation claims as ones for retaliatory harassment, and argue that Attorney General Hill's conduct did not result in a significant change to Plaintiffs' employment status and that all continued in their positions, worked without incident, and eventually left for other opportunities [Filing No. 233 at 26; Filing No. 236 at 31.] Defendants assert that Attorney General Hill standing next to Ms. Lozano at the Latino Advocacy Day event did not constitute harassing behavior and had no causal connection to Ms. Lozano's protected activity.  [Filing No. 233 at 27.] They note that Ms. Lozano had been given permission to leave any work-related event if she ever felt uncomfortable and reiterate many of their arguments as to why their response to Attorney General Hill's misconduct was reasonable. [Filing No. 233 at 27-28; Filing No. 236 at 31-32.] Defendants contend that no reasonable jury could find that the events upon which Plaintiffs rely for their retaliation claims were done out of retaliatory animus.  [Filing No. 233 at 28-30; Filing No. 236 at 33-36.] Defendants argue further that Plaintiffs never complained of Attorney General's behavior after the Sine Die Event, other than Ms. Lozano complaining that Attorney General Hill had stood next to her at the Latino Advocacy Day event, and that Ms. Lozano and Ms. DaSilva praised their jobs when they resigned. [Filing No. 233 at 31; Filing No. 236 at 36-37.]

In response, Plaintiffs argue that they suffered from an adverse employment action – a retaliatory hostile work environment.  [Filing No. 252 at 35; Filing No. 253 at 35.] Plaintiffs argue that: they were subjected to Attorney General Hill calling his accusers liars and stating that he was falsely accused; they were treated differently by legislators and staff once they were identified as

Attorney General Hill's accusers; the Attorney General refused to comply with instructions to refrain from attending legislative functions or having contact with them; Ms. Lozano overheard negative comments regarding Plaintiffs and the Sine Die Event; Ms. DaSilva and Ms. McLemore were interviewed regarding this lawsuit without their attorneys present; Ms. DaSilva had to continue interacting with Attorney General Hill as part of her job duties, and feared for her safety; Ms. Lozano had to stand next to Attorney General Hill at the Latino Advocacy Day event and thought he was trying to intimidate her; and co-workers and legislators blamed Ms. Lozano for the fact that there were no more Sine Die events.  [Filing No. 252 at 35-37; Filing No. 253 at 35-37.] Plaintiffs argue that a reasonable jury could find that Defendants are liable for the retaliatory hostile work environment because Defendants took no action to stop "the Attorney General's media frenzy," Ms. Lozano's supervisor told Ms. Lozano that there was nothing that could be done about Attorney General Hill attending the Latino Advocacy Day event, the House was on notice of Ms. Lozano being treated in a hostile manner by two legislators and of the fact that a representative had asked Ms. Lozano out, and the Senate was on notice of retaliatory comments made by senators to Ms. McLemore and Ms. DaSilva.  [Filing No. 252 at 37-39; Filing No. 253 at 37-38.]

In reply, Defendants reiterate their arguments that no reasonable jury could conclude that Plaintiffs were subjected to a retaliatory hostile work environment, or that Defendants did not take reasonable corrective action.  [Filing No. 258 at 18-22; Filing No. 259 at 16-21.]  They also argue that some of the evidence upon which Plaintiffs rely is inadmissible.  [Filing No. 258 at 17-18; Filing No. 259 at 15-16.]

In order to succeed on a retaliation claim under Title VII, a plaintiff must show: "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between her protected expression and the adverse action." *Scaife*, 49

F.4th at 1118.  The Seventh Circuit has also recognized a retaliatory hostile work environment claim, which requires a plaintiff to show that: "(1) her work environment was both objectively and subjectively offensive; (2) the harassment was in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Flanagan v. Office of Chief Judge of Cir. Ct. of Cook Cnty., Ill.*, 893 F.3d 372, 375 (7th Cir. 2018).  Here, Plaintiffs label their claim as one for retaliation, but then refer to a "retaliatory hostile work environment" in their responses to Defendants' Motion for Summary Judgment.  [Filing No. 252 at 34; Filing No. 253 at 34.]  In this case, though, this is really a distinction without a difference.  An adverse employment action for purposes of a Title VII retaliation claim "simply means an employer's action that would dissuade a reasonable worker from participating in protected activity." *Huri v. Office of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 833 (7th Cir. 2015).  Here, Plaintiffs do not allege an adverse employment action other than that they were subjected to a hostile work environment.  Even so, Plaintiffs' retaliation claims fail on several fronts.

First, Plaintiffs have not shown that their work environment was objectively and subjectively offensive.  They rely upon the following events to support their retaliation claims:

- <u>Ms. Lozano</u>

  o  Attended Latino Advocacy Day Event in January 2019, where Attorney General Hill stood right behind her and made her feel uncomfortable and intimidated, but did not speak to her or touch her;

  o  Co-workers blamed her for the fact that there were no more Sine Die events;

  o  One co-worker blamed her for the release of the Memorandum;

  o  A House member invited Ms. Lozano to dinner, which made her uncomfortable;

  o  Some co-workers were antagonistic toward her;

  o  She was not included in meetings she should have attended; and

- o House leadership met with her after Plaintiffs initiated this litigation to discuss the Latino Advocacy Day event;

- **Ms. DaSilva**

  - o Senator Tallian put her hand on Ms. DaSilva's back, asked her whether she should ask for permission to do so, and said that she did not want to be accused of anything;

  - o Heard that senators had commented that Plaintiffs got what they deserved due to the manner in which they dressed at the Sine Die Event; and

  - o Jeff Papa and Jennifer Mertz questioned Ms. DaSilva about the allegations in this case and she felt uncomfortable;

- **Ms. McLemore**

  - o Representative GiaQuinta joked to senators that he wanted to go to AJ's Lounge and a senator responded that he only wanted to go if Attorney General Hill was going to be there;

  - o Heard that senators had commented that Plaintiffs got what they deserved due to the manner in which they dressed;

  - o Overheard a senator complaining about a negative depiction of the men present at AJ's Lounge for the Sine Die Event; and

  - o Mr. Papa and Ms. Mertz spoke to Ms. McLemore after this lawsuit was filed and she felt she had to answer questions even though her attorney was not present.

The Court has no doubt that Plaintiffs felt uncomfortable at work as their identities as Attorney General Hill's accusers emerged. But the treatment they faced after reporting Attorney General Hill's misconduct – which must be viewed separately as to each Plaintiff, and not collectively – simply does not rise to the level of hostile for purposes of a claim of retaliation. Each Plaintiff experienced one isolated incident directed specifically at them: Attorney General Hill stood next to Ms. Lozano at the Latino Advocacy Day Event but he did not speak to her or touch her; Senator Tallian put her hand on Ms. DaSilva's back and joked about not wanting to be accused of anything; and Representative GiaQuinta and Senator Lanane joked in front of Ms.

McLemore about going to AJ's Lounge.  These are isolated incidents, and are neither severe nor pervasive.  *Swyear*, 911 F.3d at 881 ("[E]mployers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace.").

Additionally, Plaintiffs' more general complaints regarding their treatment after reporting Attorney General Hill's misconduct do not support their argument that they were subjected to a retaliatory hostile work environment.  Co-workers commenting that there would no longer be Sine Die events, again while perhaps making Plaintiffs uncomfortable, do not rise to the level of a hostile work environment.  *See Swyear*, 911 F.3d at 881 (overhearing co-workers making comments that were inappropriate and in poor taste did not support finding of hostile work environment).  Indeed, these comments could just as easily have been made to criticize Attorney General Hill's conduct at the Sine Die Event rather than Plaintiffs' reporting of that conduct.  There is no evidence that a House member inviting Ms. Lozano out to dinner had anything to do with her reporting of Attorney General Hill's misconduct at the Sine Die Event.  Hearing second-hand that two senators commented that Plaintiffs got what they deserved because of the way that they were dressed does not carry much weight, and they were comments made to others and of which Plaintiffs heard through the grapevine.  *See Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 903 (7th Cir. 2018) ("We would caution against elevating workplace rumors to evidence of a hostile work environment.").  Additionally, Plaintiffs' vague allegations that things were not the same at work after they reported the misconduct, or that they were not invited to meetings they otherwise should have attended, carry less weight when viewed in the context of their continued, successful employment.  All received positive performance reviews and promotions, and voluntarily left for objectively better opportunities.  And, tellingly, Ms. Lozano and Ms. DaSilva

praised their experiences working for the House and the Senate, respectively, after their resignations, and Ms. DaSilva recently expressed interest in learning about a job vacancy at the Senate.  Finally, the Court fails to see how questioning Plaintiffs about their claims that they were being retaliated against can be considered evidence of that retaliation.

And even if Plaintiffs were subjected to a retaliatory hostile work environment after they reported Attorney General Hill's misconduct, Defendants investigated Plaintiffs' complaints of retaliation after learning of them when Plaintiffs initiated this lawsuit.  Specifically, House leadership spoke to Ms. Lozano about the Latino Advocacy Day incident, reiterated to her that she could leave any work events at which she felt uncomfortable, and asked her to bring any issues to their attention if they occurred in the future, and Ms. Lozano refused to speak to them about any other incidents on the advice of her counsel.  Senate leadership met with Ms. McLemore and Ms. DaSilva regarding their allegations of retaliation, Ms. McLemore stated that she had nothing to report, and Ms. DaSilva did not want to discuss the allegations until she spoke with her attorney. Mr. Papa interviewed the individuals involved in Ms. DaSilva's and Ms. McLemore's allegations, advised them that retaliation was not tolerated, and warned them that the alleged behavior was inappropriate.  And while Plaintiffs argue that Defendants did not take action to stop Attorney General Hill from publicly defending himself and calling his accusers liars, it is unclear what Defendants could have done other than to reiterate their support for Plaintiffs and continue their investigation – which they did.  It is also unclear what more Defendants could have done to prevent Attorney General Hill from attending legislative events other than telling him not to attend – which they did.  Attorney General Hill was not Defendants' employee, and his actions were not otherwise within Defendants' control.

Because Plaintiffs have not shown that they were subjected to a hostile work environment in retaliation for reporting Attorney General Hill's misconduct at the Sine Die Event, nor that there is a basis for holding Defendants' liable for that alleged retaliation, the Court **GRANTS** Defendants' Motions for Summary Judgment, [Filing No. 231; Filing No. 232], as to Plaintiffs' retaliation claims under Title VII.

## IV.
### CONCLUSION

The Court's decision should in no way be read to condone the reprehensible behavior of Attorney General Hill – behavior that no woman should have to face, especially at the hands of one of the state's highest elected officials.  Although this litigation started out targeting that behavior, it now focuses only on the House's and the Senate's actions in response to that behavior. "Title VII 'does not guarantee a utopian workplace, or even a pleasant one,'" *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (quoting *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994)), and it "is not a code of civility," *Yuknis*, 481 F.3d at 556.  Because Attorney General Hill's misconduct does not rise to the level that the Seventh Circuit has determined is actionable under Title VII, and because no reasonable jury could conclude that the House and the Senate failed to take reasonable action in response to that misconduct or that Plaintiffs faced actionable retaliation for reporting that misconduct, there is no basis on which to hold the House or the Senate liable.  Accordingly, the Court **GRANTS** the House's Motion for Summary Judgment, [231], and the Senate's Motion for Summary Judgment, [232].  Final judgment shall enter accordingly.

Date: 11/17/2022

*Jane Magnus-Stinson*
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**